Very well, Mr. Perlstadt, we'll hear from you first. Good morning, Your Honors. May it please the Court. This case involves unique proprietary software, TextLive, that was developed by defendants to engage in telemarketing for their vendors. And the facts related to TextLive are undisputed. TextLive does not use a random number generator to generate or create ten-digit telephones. We don't dispute that. We don't argue that. What TextLive does do is it uses a random number generator to pick which telephone numbers are to be dialed. Defendants have these databases, these very large databases, tens of thousands of numbers. I think Brew House has 47,000 telephone numbers in it, and, excuse me, no other pub has about 17,000 numbers. They have these huge databases. And when defendants want to run a telemarketing, it often takes the form of a contest. And so they want to pick a subset of that database, 50, 100, 200 phone numbers, for those phone numbers to win free drinks or free happy hours. So what they do is they ask TextLive to pick 50 or 100 or 200 telephone numbers from the database to call. And TextLive uses a random number generator to do that. None of these facts are disputed. But the question on appeal here is, is whether that kind of equipment, equipment that uses a random number generator to randomly pick which numbers to call, falls within the statutory definition of an automatic telephone dialing system. It does. So let's start where we must with the statutory text. Under the statute, an automatic telephone dialing system is equipment which has the capacity to store or produce telephone numbers to be called using a random or sequential number generator. And as we contend, TextLive does this. It produces telephone numbers to be called using a random number generator. So the key question here is, what does produce mean? The statute requires a random number generator to produce telephone numbers. So the key question here is, what does produce mean? And the defendant's position, which was what the district courts below adopted, is that a random number generator has to generate or create the 10-digit telephone numbers themselves to dial. There are two problems with that reading. First, it ascribes an unduly narrow meaning to the word produce. And second, that reading has been rejected by both the Supreme Court explicitly and explicitly by the Seventh Circuit. So, counsel, are you equating the word produce with the word select? I'm not equating, but I'm saying that produce includes select. Certainly the word produce includes generate. It certainly includes equipment that generates 10-digit numbers. The question here is whether it excludes things like select. And so we don't think it does. We think it includes these additional meanings of select or, as we argue in our brief, to retrieve and bring forward. We cite contemporaneous dictionaries for that definition. We cite examples. And one example I like to use is produce ID. To get into the building this morning, I had to produce my ID to the marshals downstairs. I didn't create or generate a new driver's license. I reached into my pocket, pulled out my wallet, and produced my driver's license to the marsh. That's a perfectly acceptable, ordinary meaning of the word produce. Another example we cite is common to all lawyers and judges, and that's discovery. Litigators and litigants have to produce documents, produce witnesses. They certainly don't create new documents for that purpose, and they can't create new witnesses for that purpose. I ask my clients to go back to their files and look for responsive documents, and if they find any, produce them to the other side. They retrieve them and bring them forward and produce them to the other side. So my point is simply that the word produce, as a matter of natural language, contemporaneous dictionaries, ordinary use, is not limited to the generation of new things. It can include the retrieval, selection, and bringing forward of preexisting. Counsel, I'm going to try to phrase this to be somewhat articulate, but would you agree that the primary purpose of the statute here was to address really what the generation of random phone numbers, in other words, in particular, consecutive phone numbers for emergency services that might clog up massive amounts of telephone lines and communication lines and, in fact, businesses, all their consecutive phone numbers? That seems to be an entirely different sort of problem than what you're describing, where you have a subset of numbers that have been collected arguably with consent or at least the majority with consent. It doesn't seem like that situation brings with it the problem that Congress was trying to address here. And feel free to disagree with me on the purpose of the act. Go ahead. I certainly agree that a purpose of the act was to cover these calls to emergency rooms, calls to hospitals, calls to businesses, tying up lines. But it also was intended to protect consumers from nuisance calls and protect cell phone users from, specifically, from calls that they have to pay for or they may have to pay for. And the problem that Congress was trying to address was indiscriminate dialing. The random selection of numbers. And so defendant's proposal doesn't solve that problem. Because if you – suppose you had a database that had all 10,000 numbers with a certain three-digit prefix, and then you started – you used the TextLive software and the shuffle function to randomly pick 50 or 100 or 200 of those numbers. If that database contains emergency numbers or cell phone numbers, then that machine is going to call those numbers. And that is the problem or part of the problem that Congress was trying to address. So I just – I don't think focusing on the device or to say that the numbers have to be randomly generated is the way to solve this problem. Because the problem is just indiscriminate generating. Whatever numbers you have in the database, that's where the problem lies. So if you have a database that contains these numbers that you don't want to call or aren't supposed to call or don't have consent to call, and then you randomly select them, that is exactly the problem that Congress is trying to address. So I think the best case I have for this idea that PRODUCE includes both the idea of generating and the idea of bringing forward preexisting things is Smith v. United States. In that case, the question was whether the phrase using a firearm in a sentencing statute was limited to using the firearm as a weapon or whether it could be – it included using it in other ways. In that case, it was used as an item to barter in a guns-for-drug street. And the Supreme Court said that it includes both. It includes both meanings of the word used as a firearm. The fact the phrase clearly includes one meaning, using a firearm as a weapon, even if that's the meaning that most immediately comes to mind, that doesn't exclude other ordinary meanings of the word used. You could use a weapon as an item for trade. You could use it as a doorstop to prop open a door during a crime. Counsel, just so I'm understanding the scope of your argument or maybe the details of your argument, if the defendants here, instead of – let's say they wanted to send out a blast email to, you know, men over 30. And instead of doing a random selection of men over 30, they sent it to all of them. Would that be legal in your mind, assuming it was not a random selection or arguably not a random selection? I certainly agree, as the Supreme Court made clear, that every violation has to use – every automatic telephone dialing system has to use a random or sequential number generator. So if defendants were able to use TextLive in a manner that didn't invoke the shuffle function, that didn't randomly select which numbers to call, then I don't think it would be a violation. I agree we have to follow the language of the statute. The statute requires use of a random or sequential number generator. And my point is simply that that use is not limited to generating the numbers. Isn't that a bit of an odd result where it would encourage the defendants here to send out more texts and further clog? I don't think it's a – I don't think it's a crazy result. And I don't think it's certainly so absurd that we have to disregard the language of the statute. I think we're sort of bound by the statute. And I think the way the act has been interpreted over time is leading to some crazy results. I certainly don't think that if defendants properly get consent from their customers to text them, that they should be barred from doing it. I think maybe this case will ultimately come down to consent. But the question on appeal here is whether this device, TextLive, is an automatic telephone dialing system. It uses a random number generator. There's no dispute that it uses a random number generator. The question is how it uses that random number generator. And as we argue, it uses that random number generator to produce telephone numbers to be called, as the statutory language requires. Roberts. Counsel, does your interpretation of the statute also require phrase number generator to encompass something that selects numbers rather than generates them independently? No, because I think that's part of the whole phrase, uses a random number generator. So the random number generator here, I think a good way to think about this is the device described in the Pace amicus brief in the Facebook case. In that case, the device used a random number generator. The Pace amicus brief explains the number generated was, say, the number 13. So that is a randomly generated number. And then the 13th number in the database was the one dialed. So the equipment, I think a random number generator can generate a random number, which I think the shuffle function undisputedly does here. And then that number is used to select or pick or retrieve a number from the database. So I don't think there's any inconsistency between saying, reading produced broadly, but random number generator still has to generate a random number, just not the telephone number. And I think TextLive does that here. It uses a random number generator to generate numbers within the shuffle function to order and retrieve the numbers. If there's no more questions at this point, I guess I'll reserve the remainder of my time. If you may, thank you for your time. Thank you, Eric. Thank you. All right, Ms. Mazzuchetti, we'll hear from you next. Thank you, Your Honor. May it please the court, Gloria Mazzuchetti, for defending both of the cases before the court. I find it noteworthy that plaintiff's counsel had barely mentioned the Supreme Court's decision in Facebook. Under Facebook, there is one question that dictates whether equipment qualifies as an ATDS, an automatic telephone dialing system, and that is whether the device generates or has the capacity to generate telephone numbers either randomly or sequentially for immediate dialing or for storage and then dialing at a later time. Here, the technology in use in both of the cases, the answer to that question is undisputedly no. Plaintiff's counsel told the court that himself. And for this reason, the district court's decisions need to be affirmed. Plaintiff's proposed interpretation of ATDS relies on an out-of-context meaning of the word produce in the context of producing telephone numbers that is at odds with the Supreme Court's decision and is at odds with the language of the statute and the congressional intent and basically every court that has confronted that phrase. Starting with the Supreme Court, plaintiff wants the court to use produce as something totally different than generate. They argue that produce means select. But we know that the Supreme Court was ascribing the definition for the describing generating phone numbers when referencing producing. And we can look to the question presented on the Supreme Court's ruling in Facebook. We granted certiorari to resolve a conflict among the courts of appeals regarding whether an auto dialer must have the capacity to generate random or sequential phone numbers. Later in the opinion, on page 1171, just under point heading 3, the court explains that in the context of this dialing equipment, produce and generate are one and the same. There are a legion of cases, including the Seventh Circuit's decision in Gaddell-Hack v. AT&T, the Eleventh Circuit's decision in Glasser v. Hilton, as well as many others, including, you know, the cases on the other side of the issue leading up to the circuit split. And all note that the producing telephone numbers meant creating the phone numbers. Counsel, what about footnote 7 from the Facebook decision? How does that impact our analysis? So, importantly, footnote 7 relates to the issue of store. That's not plaintiff's arguments here, so I'll start there. Footnote 7 was trying to make sense of the fact that Congress used both words, produce and store, and courts really grappled with the issue of what does it mean to store a number using a random or sequential number generator. And in footnote 7, as plaintiff's counsel noted, there's a citation to the amicus brief submitted by the Professional Association for Consumer Engagement, PACE. And the import of that technology, of what the court was looking to, was the technology was generating the telephone numbers itself, but it wasn't necessarily dialing them immediately. It was holding on to those numbers and perhaps dialing them at a later time. And the Supreme Court and Congress found that Congress didn't want to necessarily leave open this gap where you can evade this restriction on this equipment that permitted indiscriminate dialing and could unleash all of the harms that Congress was concerned about. They didn't want to leave the gap by simply creating those numbers, storing them, and then dialing them later. So, as then-Judge Barrett explained in Gadelhack, Congress wanted to cover the waterfront. And the Supreme Court said the same thing because the last line of that footnote says, in any event, even if the storing and producing functions often merge, Congress may have employed a belt-and-suspenders approach in writing the statute. They were trying to fill that gap. They were not saying, and footnote 7 does not mean that there's a new definition that's completely at odds with everything else the Supreme Court said in Facebook, that then takes us back to merely selecting numbers from a stored list. So you read Gadelhack as supporting your position that produce is the same as generating? Without a doubt, yes, Your Honor. Yes, I read that case slightly different, and I thought that then-Judge Barrett suggested that that would be adding a word that's not in the statute, and that is general. So maybe I misread that case, but would you address why you think that opinion is important? Sure, Your Honor. I had to read that several times, too, to understand exactly what this Court was referring to with the distinction they were drawing between the district court's opinion and the Seventh Circuit's decision. And there it was really about the grammatical construction of the sentence. The Court was grappling with whether random or sequential number generator modified store and produce or modified the telephone numbers to be dialed. And basically what then-Judge Barrett disagreed with was the construction that the district court gave it, you know, from the grammatical perspective, but at the end of the decision reaches the same result. And of the ultimate holding, which is what obviously is important here, is although we adopt a different interpretation of the statute, under our reading, too, the capacity to generate random or sequential numbers is necessary to the statute. You have to be able to generate. That was on both issues. That was on both. And if we look back, and I'd like to talk a little bit about this technology and what we learned from plaintiff's experts, and as plaintiff's counsel noted in their briefings, the experts didn't really disagree on the core functionality. And let's also consider that Facebook was decided at the pleading stage. In our case, we did this deep dive under the hood discovery to look at source code to figure out what were the features of the source code that was making the computer work in doing the selection. And what plaintiff's expert explained to us was that any time a computer is selecting from a subset, putting things in an order, selecting the first, not the second, the computer is necessarily using a sequential number generator at a minimum, and perhaps a random one, too. And that's on page 494 of the record, Dr. Seamless's report. And Dr. Mitzenmacher, defendant's expert, explained as well that when a computer has to make a decision on the next step, they're often using these random or sequential number generators. It doesn't mean they're generating a number. Rather, what they're doing is deciding the next step. And so let's consider the technologies that were at issue in GattleHack and the technologies that were at issue in Glasser. You know, those were doing all of that selection, and I'll come back to that in a moment. But the important thing is this. In Facebook, that was a pleading stage motion, a motion to dismiss, and there was no discovery on what functionality was happening behind the scenes. There was no discovery regarding the source code. The Supreme Court did not know anything about Facebook's source code or how it was functioning or whether a random or sequential number generator was in use for purposes of serving up the number. And the reason it didn't need to look into those questions is it wasn't relevant to the narrow standard that it adopted. The pleading stage concession that Facebook made was that it sent text messages only to phone numbers that were associated with specified Facebook accounts with all that the Supreme Court needed to know to reach its holding that the technology at issue was disqualified on that basis from the definition of ATDS. And turning now briefly to the GattleHack and Glasser technology, while the Seventh Circuit didn't get into it as deeply as the Northern District of Illinois did, in Judge Chang's opinion in the Northern District of Illinois, Judge Chang explained that what AT&T's system was doing was actually the computer was selecting the numbers to be dialed. And it goes into a fairly detailed discussion about what the computer was doing, not the how it was doing and what the source code functionality was behind the scenes, and explains that it is undisputed that a computer and not a human was doing the selecting and that it was an automated process in place that performed a series of selection and narrowing. And then if an account had more than one number, it selected the first one, and that's the number that was used for the purpose of the text messaging. So under plaintiff's own explanation of how computers use a random or sequential number generator, that necessarily was being used here. But the Court didn't need the answers to those questions to grant summary judgment. Because they didn't matter under the standard that it enunciated. And the Facebook Court didn't need to know the answer to that question at the motion to dismiss stage either, because the standard is that narrow. They answered their question presented in the affirmative. Yes, the system must be able to generate the phone numbers in order to qualify as an ATDS. I also note that if we look at, you know, there was a growing circuit split at the time that the Court accepted certiorari in Facebook. And we had the 2nd and the 6th circuits on one side, and the 7th and the 11th circuits on the other. With respect to the 2nd and the 6th circuit decisions, the Supreme Court, after issuing its ruling in Facebook, granted certiorari, and then remanded those cases so those opinions that were inconsistent could be vacated. With respect to Gaddelhock and Glasser, the Court denied certiorari and allowed those decisions to stand. And to the extent there was any doubt whether Gaddelhock was as clear as I'm communicating that it was, and I do think that it is, given the ultimate holding. If we look at Glasser, Judge Sutton, I believe it was Judge Sutton writing for the 7th circuit, sorry, but if we look at Glasser, I'm sorry, it was the 11th circuit decision, it's very, very clear that that was a holding that required the generation of the numbers. And because the equipment at issue didn't generate the numbers, the equipment was deemed disqualified, despite that it was sophisticated equipment and did many of the things that I believe that the Plaintiff's Counsel is complaining about here. And then finally, I just would like to go back to the narrow interpretation that the Supreme Court announced in Facebook. The Supreme Court itself on page 1172 described its opinion and the statutory construction of the term automatic telephone dialing system as narrow. It very clearly found that the equipment restricted is a narrow category of equipment that was prevalent and in use in 1991, but not in use today. It didn't trouble the court, and it grappled with the issue of this is senescent technology, and the court's reaction was, well, then your issue is with Congress, not with a judicial fix, to trying to address equipment that was not even in contemplation in 1991, nor did it exist. But this narrow category of equipment, according to the Supreme Court, must generate the phone numbers either randomly or sequentially, dial them immediately, restore those numbers for later dialing, and it necessarily excludes equipment that dials from a stored list of a customer database. And if Your Honors were to accept the interpretation that plaintiffs are advocating for here, we would be back to the Ninth Circuit's ruling, and the reason why is this. Dialing automatically from a stored list of numbers requires, in most instances, selection. It requires, in many of the technology that we're talking about that's in use today, of pulling a sublist or a subset and dialing them in an order or some sort of sequence. Every computer works that way. So if we were to interpret this statute, to write into the statute the concept of selection, we would be effectively going back to that Ninth Circuit standard that would be enough to dial in an automated way using a computer from a stored list. And with respect to the context, I do note that the best case that plaintiffs rely upon has nothing to do with the TCPA. It has to do with the using firearms. It doesn't even deal with the word produced. The cases interpreting TCPA, as I said, including those that are creating the circuit split, including those that were on the other side of the issue, all recognize that produced meant generating the numbers, and that was the big brouhaha because it was going to exclude a lot of modern-day technology and really only apply to the technology that Congress at the time described as revolutionary because it could create numbers and dial indiscriminately. So, you know, if we think about produced, and there's other words we can think of, that we all know what they mean in context. And one thing that we learned from the Supreme Court's decision is how much context matters. The Supreme Court didn't just look to the grammatical construction, the words used by Congress. They looked to the meaning and why Congress was using them. And if I can give an example, when we say that Your Honors took the bench this morning, everybody in this courtroom knows that that meant that you came out into this courtroom, and in the case of Judge Colleton, in another courtroom it appears, and took your position. Nobody in this courtroom would think that Your Honors came into this courtroom, picked up a piece of furniture, and made off with it out of the courtroom. But we all know what produced means in the context of all the courts, at least, and the Supreme Court told us that in the context of the TCPA, produced means generate. The Supreme Court finally, you know, they warned about explaining how narrow its decision is of using a chainsaw to address a problem that Congress designed to attack with a scaffold. If plaintiff's definition is adopted, we go back to the chainsaw. We go back to bringing in all of the equipment that was excluded when the Supreme Court announced its decision in Facebook. Thank you. See, before you sit down, I have a question, not about the merits of the case, but I see that the briefs in this case were filed under seal based on an order of the clerk. Is there a need to file briefs in this case under seal? It is, after all, a public proceeding with public oral arguments, and I presume the parties would like a published opinion. I believe the reason for the sealing, Your Honor, is that there was some consumer-protected information when we were revealing some of the functionality. There may have been consumer-protected information. I understand that's why a lot of the record in this case ultimately became sealed, but we certainly could consider whether the briefs themselves can be on the public docket and let the court know. All right. Well, you don't have a current position on whether the briefs need to be sealed? I believe we filed them under seal for that reason, Your Honor, to protect the consumer information, and I would just want to take a pass through to confirm that that is why we did that. But that is the only interest. We might put out an order on it, and we'll consider that later. Thank you for addressing it. Thank you, Your Honor. All right. Mr. Krostat, we'll hear from you and Roberto. Thank you, Your Honor. A couple things. I'll start with Facebook and Gatorhawk. Those were addressing different questions, and I'm certainly not citing Facebook and Gatorhawk to support my position, but I think what it does is it rejects defendant's position. Facebook in footnote 7 said an autodialer, by which it meant an automatic telephone dialing system, might use a random number generator to determine the order in which to pick phone numbers from a pre-produced list. So if the Supreme Court in Facebook thought that a random number generator had to be used to generate the ten-digit numbers, I don't think it would have said this in the footnote. It wouldn't have said that an autodialer under the statute can use a random number generator to determine the order in which to pick phone numbers. That's pretty much what TextLive does here. It uses the random number generator to pick and order phone numbers from a pre-existing list. So I just don't think defendants in the district court's position is consistent with footnote 7. And then I think in Gatorhawk, I think Gatorhawk explicitly rejected defendants. In Part B of the opinion, then-Judge Barrett considered the idea of whether the random number generator had to generate the actual telephone numbers, and she rejects that out of hand. She says that would require inserting another word into the statutory definition, so that the statutory definition would have to say equipment which has the capacity to store or produce telephone numbers to be called generated using a random or sequential number generator. She says you would have to insert the word generated into the statutory language. And she says we can't do that. The words of Congress do not permit this reading. If Congress had wanted to limit the use of a random number generator to generating ten-digit numbers, it probably would have written it, as Judge Barrett suggests, using a store or produce telephone numbers to be called generated using a random or sequential number generator. But the statute doesn't say that. It just says produce telephone numbers to be called using a random number generator. The equipment at issue in Facebook and Gatorhawk were both different. There's no evidence there that either system used a random number generator to select the numbers. In Facebook, calls were made in response to logins from unknown devices, and in Gatorhawk, it was calls made in response to customer services. There's no suggestion in those cases. They just didn't deal with cases where a random number generator was used to select the numbers. In response to my friend's point about every computer using a selection, a random or sequential selection method, I'm just not sure that's the case. I think that their expert disputes that idea. I think it's easy to imagine other ways in which telephone numbers can be selected. They could tell TextLive, text everybody that has a birthday this month, or text people starting with the longest time it's been since we've last contacted them. Those are two ways that numbers can be selected without using a random number. In fact, the other texting system in the background here, the SendSmart, the SendSmart system which sent a message to Mr. Beal, we had to abandon that because we couldn't find evidence that it used a random number generator. It didn't have the kind of similar shuffle function as TextLive did. I also agree with my friend's point that we need to use a scalpel, not a chainsaw, to interpret this text, and that's what we're asking for here. This is really unique software. In my experience, I haven't seen other software like this that uses a random number generator, this shuffle function, to do what TextLive does because it wants to pick a subset of numbers randomly for a contest. This is really unique software. I think it falls within the statutory definition, and I think Your Honors should reverse the lower court's opinion. I see my time is up, but if you want me to, just one moment on the seal issue. Our position is we... What? On the what question? On the motion to seal, to keep these briefs under seal. Oh, yeah. I saw your motion says you're agnostic. Yeah, we don't care whether it stays under seal or not. All right, we'll discuss it and put out an order if it requires further mention. Thank you. Thank you, Your Honors. All right, thank you to both counsel for your arguments. The case is submitted. The court will follow decision in due course. Counselor excused.